UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| BAVARIA INN RESTAURANT, INC. | ) | Case No. 20-17488 EEB |
| dba Shotgun Willies | ) | Chapter 11 |
| a Colorado Corporation | ) | |
| EIN 84-0725727 | ) | |
| | ) | |
| Debtor. | ) | |

**PLAN OF REORGANIZATION FOR**
**SMALL BUSINESS UNDER CHAPTER 11, SUBCHAPTER V**

Bavaria Inn Restaurant, Inc. dba Shotgun Willies ("Bavaria" or "Debtor"), the Debtor-in-Possession in this Chapter 11 case, sets forth its Plan of Reorganization dated February 16, 2021 as follows:

## I.   INTRODUCTION

1.1 -   This document constitutes the Plan of Reorganization for the Debtor.  This document is designed to provide all creditors and parties in interest with sufficient information with which to make an informed vote as to the acceptance or rejection of the Debtor's Plan.

1.2 -   Any terms which are set forth in this document and defined in the Bankruptcy Code shall have the meaning attributed to them as set forth on Appendix A attached hereto.

1.3 -   Pursuant to the Bankruptcy Code, only Classes of Claims or Interests that are "impaired" under the Plan are entitled to vote to accept or reject the Plan.  Classes of Claims and Interests that are not impaired are not entitled to vote and are deemed to have accepted the Plan.  Voting on the Plan shall be pursuant to the provisions of the Bankruptcy Code and the Bankruptcy Rules, and a Class shall have accepted the Plan if the Plan is accepted by at least two-thirds in amount and more than one-half in number of the Allowed Claims of such Class actually voting.  Each holder of an Allowed Claim in Classes 1 through 6 shall be entitled to vote to accept or reject the Plan.

1

1.4 - Regardless of creditor votes, if the Plan meets all of the applicable requirements of Section 1129(a) of the Bankruptcy Code, other than subsections (8), (10), and (15), the Court may confirm the Plan if it does not discriminate unfairly, and is fair and equitable with respect to each class of claims or interests that is impaired under, and has not accepted, the Plan.

1.5 - As discussed more fully below, the Debtor firmly believes that the Plan represents the best alternative for providing the maximum value for creditors. The Plan provides creditors with a distribution on their Claims in an amount greater than any other potential known option available to the Debtor.

1.6 - THIS PLAN AND THE DISCLOSURES CONTAINED HEREIN HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION. THE COMMISSION HAS SIMILARLY NOT REVIEWED THE ACCURACY OR ADEQUACY OF THIS PLAN.

## II.   HISTORY AND EVENTS LEADING TO BANKRUPTCY

In 1982 Debbie Matthews Dunafon's husband acquired what became a 43% interest in Bavaria Restaurant Inn, Inc. (dba Shotgun Willies). As an investment, the couple took no part in operations which were managed by a management company. Under the terms of their 1989 Divorce Agreement, Debbie was given all of the Bavaria stock. In 1991, she acquired an additional 9% making her the majority owner. Debbie had been a stay-at-home mom raising her three children at a ranch outside Morrison, originally homesteaded by her great grandfather in 1871.

When Debbie had acquired her interest in Bavaria, the management firm was operating Shotgun Willies' day-to-day business and it viewed Debbie as an "easy mark" since she was a single mom and had no background in the operations of night clubs, generally, or gentlemen's clubs, in particular. The managers developed a strategy which they believed would allow them to take over the business. Management was frequently accused of employee abuse such that their conduct was endangering Bavaria's liquor license. The managers were surprised to learn that Debbie discovered their self-dealing and misconduct, and she fired them. By necessity, she had to take over day to day operations of the club herself. It is believed that she became the first woman to operate a gentlemen's club in the United States.

2

Debbie gained notoriety in the industry because she was not only able to successfully operate the club, but was also reputed to have managed the most successful gentlemen's club in the country. Indeed, Shotgun Willies became a worldwide brand. Part of Debbie's success stemmed from the fact that she hired women for key positions in the club which previously had been the province of men only. She sent managers to Florida to be trained by the Walt Disney Company in customer relations. She also became active in the Glendale business community having become a board member of the Greater Glendale Chamber of Commerce and served as its president for a period of time. She began raising money for local charities through golf tournaments and other events and in 1995, she started an annual event to provide the homeless a full Thanksgiving dinner and clothing for the winter.

Given that dancing at a gentlemen's club is a relatively short-term occupation, Debbie instituted a program to provide dancers with the ability to acquire skills to qualify them for a livelihood post dancing, including one who became a helicopter pilot, and another who became an electrical contractor.

Unlike most gentlemen's clubs, Shotgun Willies has a women friendly environment which on weekends has at least 30% women patrons.

In 2013, Bavaria built a new premises which sits upon land owned by a third party, Coal Creek Partners, LLC ("Coal Creek"). In connection with the construction of the new building, Bavaria entered a land lease with Coal Creek (Lease) and borrowed $3.1 million from Citywide Banks ("Citywide") for the construction of the building.

Upon opening its new facility, Bavaria commenced an enhanced marketing strategy to improve its revenue and to insure that it would be able to afford the Citywide loan payments. This new marketing plan included staying open longer hours until much later in the morning. Although this effort was successful, new approaches are mandated by Covid-19 and participation in the Gold Star program.

In March 2020, Governor Polis declared a state emergency because of COVID-19, and he ordered the closing of bars and restaurants. Over the last year the Governor has allowed, at times, partial reopening with limited capacity and limited hours which

constantly vary. These restrictions resulted in a decrease in Bavaria's revenues to $3.4 million for 2020, approximately one half of the prior six-year average.

Because of Gubernatorial orders entered in connection with the pandemic, Bavaria was forced to close for nearly three months during 2020 and upon reopening, was severely restricted in its hours of operation. Indeed, at the time of the filing of the petition, Bavaria was closed and did not reopen until early January, but then only with restricted operations. These restrictions continue through the date of the filing of this Plan.

Colorado has adopted the Five Star program. If an establishment makes certain capital improvements and adopts restrictions and procedures prescribed by the program, it will reduce, but not eliminate, the risk of another extended shutdown and will insure that Bavaria may maintain capacities of 50%. Nevertheless, it is highly unlikely that in the foreseeable future Bavaria will be able to successfully sustain its operations unless it participates in the Five Star program. The capital improvements required for Bavaria to meet Five Star approval are anticipated to cost at least $250,000, and possibly as much as $500,000. This expenditure, coupled with wide spread industry projections for reduced revenues post-Covid, will significantly impact Bavaria's future performance, including during the term of the Plan.

To be sure, these steps, while helping to insure the future viability of Bavaria, will also reduce it revenues and will require an investment in capital improvements to its premises including upgrading the ventilation and air filtration systems, instituting intensified clean up and sanitization protocols and a myriad of other requirements under the Five Star Program.

During the course of performing due diligence in connection with investigating the Chapter 11 filing for Bavaria, counsel discovered that it had been miscalculating the escalator provision in the Lease. While the amount of the miscalculation is in sharp dispute, the fact of the miscalculation is not. Debtor's calculation of the rent miscalculation and arrearage amounted to $801,000. On the other hand, Coal Creek has calculated the arrearage at $3.3 million. This discrepancy arises from the two different ways the escalator provision in the lease can be interpreted.

4

Bavaria calculated the arrearage by adding the annual escalator to the original "Base Rent" under the lease to arrive at the following year's rent, Whereas Coal Creek calculated the arrearage by adjusting each year's new rent by using the previous year's adjusted rent as the Base Rent.

The parties have engaged in extensive negotiations to resolve this discrepancy and which will permit an assumption of the Lease. As outlined in greater detail in the Motion to Assume Non-Residential Real Property Lease filed (or to be filed), the Lease shall be modified to increase the monthly rental to $25,000 (the approximate amount the monthly rent would currently be under Bavaria's interpretation of the escalator provision in the Lease as well as what Bavaria and Coal Creek understand the fair market value of rent to be for its location). Furthermore, provided the Plan is confirmed, Bavaria shall not be required to "cure" the Lease default as mandated by the Bankruptcy Code. Instead of requiring that Bavaria cure the default, Coal Creek has agreed to being treated as an allowed unsecured creditor for $801,000 and has also agreed that Confirmation of Bavaria's Plan shall constitute "adequate assurance of future performance".

Scott Saltzman, with input from Bavaria, has drafted projections for the 5-year period of the Plan. These projections take into consideration the uncertainties the pandemic continues to present. For the five-year total, Bavaria projects $2,110,000 net cash flow which can be paid to creditors under the "disposable income" requirement of the Code. In lieu of keeping the case open for five years and the risks attendant thereto, Bavaria shall pay $865,000 to Unsecured Creditors upon confirmation of the Plan. This money will be provided to Bavaria by Debbie Dunafon and represents the present value of Bavaria's 5-year projected net cash flow. See Exhibit 1. Bavaria shall deposit the $865,000 into an interest-bearing account (the "Plan Payment Fund"). This amount shall be disbursed on the Effective Date for Unsecured Creditors, which is that date when all of the Litigation Claims are resolved by a judgment which becomes a Final Order or a settlement is reached and approved by a Final Order of the Bankruptcy Court. It is not until that time that each creditor's pro-rata share of the Plan Payment Fund can be calculated.

5

## III.   PLAN OVERVIEW AND CLASSIFICATION OF CLAIMS AND INTERESTS

| CLASS | STATUS | TREATMENT |
|---|---|---|
| Class 1 – Allowed Secured Claim of Citywide Banks | Impaired | Paid in full according to the terms of the Note with interest at 4.5% per annum amortized over 20 years. The Class 1 creditor shall retain its senior lien position on Debtor's assets. Regular payments under the Note at the non-default rate shall commence on the month following the date the Confirmation Order enters. Payments shall be $12,547 monthly. |
| Class 2 – Allowed Secured Claim of SBA | Unimpaired | Paid in full according to the terms of the Note with interest at 3.75% per annum amortized over 30 years. The Class 2 creditor shall retain its junior lien position. Loan payments shall commence June 1, 2021 as provided for in the Note. Payments shall be $731 monthly. |
| Class 3 – Allowed Unsecured Creditors excluding Litigation Claims | Impaired | The Class 3 creditors shall each be paid their *pro rata* share of the Plan Payment Fund along with the Class 4 through 6 claims. |
| Class 4 – Disputed and Contingent Claim of Dory E. Wright | Impaired | This claim shall be litigated to finality in the State Courts. Should the Class 4 Creditor obtain a judgement which becomes a Final Order or a Settlement is reached and approved by the Bankruptcy Court for an amount less than or equal to or less than the insurance policy limits, the Class 4 creditor shall not receive a distribution from the Plan Payment Fund. Should a Final Order be entered by judgement or settlement for an amount in excess of insurance policy limits, the Class 4 creditor shall have an allowed claim for the difference between the Final Order amount and the policy limits, and shall receive a pro rata share of the Plan Payment Fund. The pro rata share of the Class 4 creditor shall be based upon only the excess amount being utilized in calculating pro--rata distributions. The insurance carrier has issued a Reservation of Rights Letter suggesting that coverage may be limited to $1 million. |

6

| | | |
|---|---|---|
| Class 5 – Disputed and Contingent Unsecured Claim of Charles McClure | Impaired | This claim shall be litigated to finality in the State Courts. Should the Class 5 Creditor obtain a judgement which becomes a Final Order or a Settlement is reached and approved by a Final Order of the Bankruptcy Court, the Class 5 Creditor shall receive a pro-rata distribution from the Plan Payment Fund. |
| Class 6 – Disputed and Contingent Unsecured Claims of Carmen Electra, Lucy Pinder, and Dessie Mitcheson | Impaired | These claims shall be litigated to finality in the State Courts. Should the Class 6 creditors obtain judgements which become Final Orders or a Settlement(s) is reached, and approved by a Final Order of the Bankruptcy Court, the Class 6 creditors shall receive pro-rata distributions from the Plan Payment Fund. |

## IV.   **DESCRIPTION OF ASSETS**

The values of the Debtor's assets on the projected Confirmation Date, June 1, 2021 are rounded and are set forth in the following chart:

| **Asset** | **Estimated Value** |
|---|---|
| Cash and Bank Accounts | $350,000 |
| Building | $2,000,000 |
| Accounts Receivable | $75,000 |
| Liquor inventory | $25,000 |
| Furniture, Fixtures & Equipment | $50,000 |
| Total | $2,500,000 |

The asset values set forth above are as of the projected Confirmation Date of June 1, 2021. The value of these assets is book value based on liquidation value unless otherwise noted.  The Debtor's assets are comprised of cash, bank accounts, a building, furniture, fixtures & equipment, and liquor inventory. Moreover, the building is not moveable and cannot be liquidated since it sits on property the Debtor does not own.

Scott Saltzman, approved by the Bankruptcy Court as Debtor's expert valuation professional, has determined that the fair market value of the business is $1,195,000.00.

7

**Avoidance Actions**

Debtor has identified no Avoidance Actions pursuant to 11 U.S.C. Sections 545 through 550. Payments made to vendors were all made in the ordinary course of business and according to ordinary business terms, and are therefore not avoidable under Section 547 of the Code. In addition, Debtor was not insolvent during any relevant time period for the avoidance of transfers, and therefore, there are no known claims pursuant to Section 548 of the Code.

## V.   CLAIMS AND INTERESTS

### A. UNCLASSIFIED PRIORITY CLAIMS

Claims which are more particularly defined under Section 507(a)(1), 507(a)(2) or 507(a)(8) of the Bankruptcy Code are not classified and will be paid in full on the effective date of the Plan.  These claims consist of administrative expenses incurred during the course of the Chapter 11 case, claims incurred in an involuntary case (which are not applicable) and certain priority tax claims.

### B. ADMINISTRATIVE EXPENSE CLAIMS

The Debtor retained Weinman & Associates, P.C. as its bankruptcy counsel. The Debtor provided Weinman & Associates, P.C. with a retainer in the amount of $22,000.00.  The Debtor estimates that the total legal fees for Weinman & Associates, P.C. through Plan confirmation will be $50,000. The total amount anticipated to be owed to Weinman & Associates, P.C. after payments received pursuant to the Court's Interim Advance Payment Procedures Order, will be approximately $15,000 depending upon litigation over the Plan.

The Subchapter V Trustee, Harvey Sender, also has an administrative expense claim for fees incurred during the course of the Debtor's bankruptcy case. The Debtor estimates that Mr. Sender's fees are not expected to exceed $10,000 less payments received pursuant to the Court's Interim Advance Payment Procedures Order, and depending upon litigation over the Plan.

The Debtor retained GSL Trial Lawyers as its General Counsel and Special Litigation Counsel. Debtor believes that it may owe GSL Trial Lawyers approximately $25,000 for services performed through the conclusion of the

8

Chapter 11 case less payments received pursuant to the Court's Interim Advance Payment Procedures Order, and depending upon litigation over the Plan.

The Debtor retained Peter R. Bornstein, Esq. as its Special Counsel to provide legal services in defense of the Debtor in the currently stayed case in the District of Colorado entitled, *Lucy Pinder, et. al v. Bavaria Inn Restaurant, Inc. d/b/a Shotgun Willie's, Civil Action No. 19-cv-00259-LTB-STV*. Debtor believes that it may owe Peter R. Bornstein, Esq. approximately $5,000 for services performed through the conclusion of the Chapter 11 case, less payments received pursuant to the Court's Interim Advance Payment Procedures Order.

The Debtor retained Scott Saltzman, CPA with Saltzman LLC as an Expert Witness for the Debtor to value Debtor's business including cash flow projections. Debtor believes that it may owe Scott Saltzman, CPA and Saltzman LLC approximately $20,000 for services performed through the conclusion of the Chapter 11 case, less payments received pursuant to the Court's Interim Advance Payment Procedures Order, and depending upon litigation over the Plan.

The administrative expense claims for professionals shall be paid on the latter of the Effective Date or the entry of Final Orders approving professional fees.

### C. TAX CLAIMS

Debtor is aware of no tax claims, however, the IRS has filed a Proof of Claim for $500, $300 of which is identified as a priority claim. Debtor shall further investigate this Proof of Claim and, if valid, it will be paid on the Effective Date for Secured Creditors.

### VI.   CLASSIFIED CLAIMS

6.1 -  **CLASS 1. Citywide Banks.** The Class 1 Secured Claim consists of the Allowed Secured Claim of Citywide Banks in the amount of $1,957,288. The Class 1 claim is secured by substantially all of the assets of the Debtor and shall be paid in full according to the terms of the Promissory Note with interest at 4.5% per annum, amortized over 20 years. The Class 1 creditor shall retain its senior lien position on Debtors assets. The Class 1 Claim is impaired since upon Debtor's Petition having been filed, the Class 1 creditor placed the loan in default as a

9

consequence of the Bankruptcy filing. Regular payments under the Note at the non-default rate shall commence on the month following the date the  Confirmation Order enters. Payments shall be $12,547 monthly.

6.2 -  **CLASS 2. SBA.** The Class 2 Creditor consists of the allowed secured claim of the SBA in the amount of $150,000 for an EIDL loan. The Class 2 creditor claim is secured by substantially all of the assets of the Debtor and shall be paid in full according to the terms of the Note with interest at 3.75% per annum, amortized over 30 years. The Class 2 creditor shall retain its junior lien position. Loan payments shall commence in June 1, 2021 as provided for in the Note. The monthly payment shall be $731. The Class 2 claim is unimpaired.

6.3 -  **CLASS 3. Unsecured Creditors Excluding Litigation Claims.** The Class 3 creditors shall each be paid their pro rata share of the Plan Payment Fund along with the Class 4 through 6 Claims. The Class 3 claims are impaired.

6.4 -  **CLASS 4. Disputed and Contingent Unsecured Claim of Dory E. Wright.**  The Class 4 claimant has filed a Proof of Claim in the amount of $5,633,000. This claim shall be litigated to finality in the state courts. The Claim of the Class 4 Creditor is insured to a maximum level of $2 million (the insurance carrier has sent a Reservation of Rights Letter indicating that coverage may only be a maximum of $1 million). Should the Class 4 Creditor obtain a judgement which becomes a Final Order or a Settlement is reached and approved by the Bankruptcy Court for an amount less than or equal to the maximum insurance coverage, the Class 4 creditor shall not receive a distribution from the Plan Payment Fund. Should a Final Order be entered by judgement or settlement for an amount in excess of the maximum insurance coverage, the difference between the Final Order amount and the maximum insurance coverage, shall receive a pro rata share of the Plan Payment Fund. The pro rata share of the Class 4 creditor shall be based upon only the excess amount being utilized in calculating pro--rata distributions. The above assumes that the Class 4 creditor is entitled to an amount in excess of the maximum insurance coverage. Should the Allowed Claim of the Class 4 creditor be equal to or less than the amount of insurance coverage, the

Class 4 creditor shall receive no distribution from the Plan Payment Fund. The Class 4 claim is impaired.

6.5 - **CLASS 5. Disputed and Contingent Unsecured Claim of Charles McClure.** The Class 5 claimant has filed a Proof of Claim in the amount of $75,000. This claim shall be litigated to finality in the state courts. Should the Class 5 Creditor obtain a judgement which becomes a Final Order or a Settlement is reached and approved by a Final Order of the Bankruptcy Court, the Class 5 Creditor shall receive a pro-rata distribution from the Plan Payment Fund. The Class 5 Claim is impaired.

6.6 - **CLASS 6. Disputed and Contingent Unsecured Claim of Carmen Electra, Lucy Pinder, and Dessie Mitcheson.** The Class 6 claimants have filed Proofs of Claim in the amounts of $200,000, $60,000, and $40,000, respectively. These claims shall be litigated to finality in the state courts. Should the Class 6 creditors obtain judgements which become Final Orders or a Settlement(s) is reached, and approved by a Final Order of the Bankruptcy Court, the Class 6 creditors shall receive pro-rata distributions from the Plan Payment Fund. The Class 6 Claims are impaired.

## VII.   EXECUTORY CONTRACTS AND UNEXPIRED LEASES

7.1 -   The Debtor assumes, the following executory contracts and unexpired leases as of the Effective Date:

    a. Coal Creek Partners, LLC;

    b. Smoking Gun Land Company;

    c. All leases and contracts that are not specifically rejected, including insurance contracts.

7.2 -   The Debtor will be conclusively deemed to have rejected all executory contracts and unexpired leases for which a motion to reject has been granted or is pending as of the Effective Date.  A proof of a claim arising from the rejection of an executory contract or unexpired lease under this section must be filed no later than **45** days after the date of the order confirming this Plan.

## VIII.   FEASIBILITY OF THE PLAN

The Debtor's Plan is feasible because the Plan Payment Fund shall be funded

immediately following Confirmation, but in no event later than the Effective Date for Secured Creditors. Evidence of the availability of the funds to deposit into the account which shall constitute the Plan Payment Fund shall be provided at Confirmation.

Scott Saltzman has prepared cash flow projections attached hereto as Exhibit 1 which reflect a realistic prediction of the Debtor's operations during the five (5) year period following confirmation of the Plan. These projections show an accumulated net cash flow available to pay creditors in the total amount of $2,100,000 over the five (5) year period. Debtor has chosen to pay a Discounted Present Value of the total projected net cash flow which amount is $865,000. This amount shall be paid pro rata to Unsecured Creditors with Allowed Claims in Classes 3 through 6. The projections also demonstrate the ability to pay the Secured Creditors in Classes 1 and 2.

The funds deposited into the account representing the Plan Payment Fund will come from Debbie Dunafon, Debtor's President. Since it is possible that the total amount of the Allowed Claims will not be known until all litigation claims are determined with finality, the Plan Payment Fund shall be placed in an interest-bearing account on the Effective Date for Unsecured Creditors and not disbursed until all Allowed Claims are known. Unless the Bankruptcy Court orders otherwise, the Plan Payment Fund account shall comply with the provisions of Section 345 of the Bankruptcy Code. Once known, distribution shall be made within 30 days from the date the last litigation claim is approved by a Final Order or an Order of the Bankruptcy Court.

Given the extraordinary impact the Covid-19 pandemic has had on the hospitality industry in general, and bar and restaurant businesses in particular, as well as the uncertainty of the performance and survival of such businesses, including the Debtor, it is submitted that creation of the Plan Payment Fund alleviates the great risk and uncertainty of the Debtor's performance and survival over the longer term. Indeed, a bird in hand is worth more than possibly nothing in the bush.

## IX.    LIQUIDATION ANALYSIS

The principal alternative to a Debtor's reorganization under Chapter 11 is a conversion of the case to Chapter 7 of the Bankruptcy Code.  Chapter 7 requires the liquidation of the Debtor's assets by a Trustee who is appointed by the United States Trustee's office.  In a Chapter 7 case, the Chapter 7 Trustee would take over control of

the Debtor's assets.  The assets would be liquidated and the proceeds distributed to creditors in the order of their priorities. More likely, Citywide Banks would seek and obtain relief from stay and foreclose on all of Debtor's assets.

As set forth on the Liquidation Analysis attached hereto as Exhibit 2, if the Debtor's case were converted to a case under Chapter 7, the sale of the assets would be insufficient to pay the secured claims in full. Indeed, there would be nothing for Unsecured Creditors. Also, as set forth in the liquidation analysis, based upon the value of the business sold as a going concern, as determined by Scott Saltzman, is $1,195,000. This would be insufficient even to pay the lien of Citywide Banks.

It is only through confirmation of the Plan that Unsecured Creditors will receive anything on account of their claims. Indeed, as can be seen from Exhibit 5, creditors can anticipate receiving anywhere between 16.7% and 76% of their claims depending upon the results of the Litigation Claims.

## X.    TAX CONSEQUENCE

The Debtor is not providing tax advice to creditors or interest holders.  **U.S. Treasury Regulations require you to be informed that, to the extent this section includes any tax advice, it is not intended or written by the Debtor or its counsel to be used, and cannot be used, for the purpose of avoiding federal tax penalties.**  Each party affected by the Plan should consult its own tax advisor for information as to the tax consequences of Plan confirmation. Generally, unsecured creditors should have no tax impact as a result of Plan confirmation.  The recovery of each creditor is payment on account of a debt and generally not taxable, unless the creditor wrote off the debt against income in a prior year in which case income may have to be recognized.  Interest holders may have very complicated tax effects as a result of Plan confirmation.

## XI.    IMPLEMENTATION OF THE PLAN

11.1 - **Effectuating the Plan.**  On the Effective Date for Secured Creditors, Debtor shall establish the Plan Payment Fund from which all Unsecured Claims will be paid. This date is projected to be July 1, 2021.

13

11.2 - **Disputed Claims.**  The Debtor may file an objection to any claim no later than 45 days following the Effective Date for Secured Creditors. The Debtor intends to object to all Litigation Claims. Exhibit 3 contains a complete listing of Unsecured Creditors which includes the Proof of Claim amounts filed by certain creditors. Debtor does not intend to object to any Unsecured Claims listed on Exhibit 3 which are not Litigation Claims. The Debtor does not believe there are any avoidance claims in this case.

11.3 - **Administrative Expense Bar Date.**  Any creditor seeking allowance and payment of an administrative expense priority claim must do so no later than 60 days following the entry of the Order confirming the Plan.

11.4 - **Final Decree.**  The Debtor will request entry of a final decree within 180 days of the Effective Date for Secured Creditors.

11.5 - **Discharge.** If the Debtor's Plan is confirmed under § 1191(a), on the Effective Date for Secured Creditors, the Debtor will be discharged from any debt that arose before confirmation of this Plan, to the extent specified in § 1141(d)(1)(A) of the Code, except that the Debtor will not be discharged of any debt:

(i) imposed by this Plan; or
(ii) to the extent provided in § 1141(d)(6).

If the Debtor's Plan is confirmed through a nonconsensual confirmation under § 1191(b), confirmation of this Plan does not discharge any debt provided for in this Plan until the court grants a discharge on completion of all payments due within the first 3 years of this Plan, or as otherwise provided in § 1192 of the Code. In view of the fact that all Unsecured Creditor payments will be escrowed in the Plan Payment Fund account on the Effective Date for Secured Creditors, Debtor shall seek its discharge immediately following deposit of the funds into the Plan Payment Fund account.

11.6 - **Contractual Relationship & Default.**  The Plan, upon confirmation, constitutes a new contractual relationship by and between the Debtor and its creditors. In the event of a default by the Debtor under the Plan, including failure to timely file and pay any post-petition taxes, creditors shall be entitled to enforce all rights and remedies against the Debtor for breach of contract, the Plan.  Any secured creditor claiming a breach of the Plan by the Debtor will be able to enforce all of their rights and remedies including foreclosure of their deed of trust, security agreement, lien, or mortgage pursuant

14

to the terms of such document.  Any creditor claiming a breach by the Debtor must provide written notice to the Debtor and counsel for the Debtor of the claimed default, the notice must provide the Debtor a ten (10) day period within which to cure the claimed default, unless a longer period is specified elsewhere in the Plan.  Upon the Debtor's failure to cure the default within such ten-day period, the creditor may proceed to exercise their rights and remedies under applicable State and Federal Law, including seeking to enforce the terms of the Plan or conversion of the Debtor's case to a case under Chapter 7.

11.7 -  **Executory Contracts and Unexpired Leases.**  All executory contracts and unexpired leases which were entered into by the Debtor pre-petition, and not assumed by order of the Bankruptcy Court, are assumed as of the Effective Date for Secured Creditors.

11.8 -  **Revestment.**  The entry of an Order confirming this Plan shall revest in the Debtor all property of the estate free and clear of all liens except those specifically set forth in the Plan.

11.9 -  **Retention of Jurisdiction**.  Notwithstanding confirmation of the Plan, the Court shall retain jurisdiction for the following purposes:

a. Determination of the allowability of claims upon objection to such claims by the Debtor-in-Possession or by any other party in interest;

b. Determination of the request for payment of claims entitled to priority under 11 U.S.C. Section 507(a)(1), including compensation of the parties entitled thereto;

c. Resolution of any disputes regarding interpretation of the Plan;

d. Implementation of the provisions of the Plan and entry of orders in aid of consummation of the Plan, including without limitation, appropriate orders to protect the revested Debtor from action by creditors;

e. Modification of the Plan pursuant to 11 U.S.C. §1193;

f. Adjudication of any causes of action, including avoiding powers actions, brought by the Debtor-in-Possession, by the representative of the estate or by a Trustee appointed pursuant to the Code;

g. Adjudication of any cause of action brought by the Debtor-in-

15

Possession, by a representative of the estate, or by a Trustee appointed pursuant to the Code, or the revested Debtor exercising rights and powers as provided in 11 U.S.C. §542-549.  This section shall not be construed to limit any other power or right which the Debtor may possess under any section of the Code; and

h.      Entry of a final decree.

11.10 -    **Satisfaction of Claims.**    Except as otherwise required by or provided in this Plan, the Debtor shall receive a discharge on the confirmation date pursuant to Section 1141(d). Confirmation of the Plan shall constitute a modification of any note or obligation for which specification and treatment is provided under the Plan as set forth in the Plan.  Any obligation or note, previously in default, so modified, shall be cured as modified as of the Confirmation Date.   This provision shall be operable regardless of whether the Plan provides for any obligation to be evidenced by a rewritten loan or security document following confirmation of the Plan.

11.11 - **Headings**.   The headings used in the Plan are for convenience of reference only and shall not limit or in any manner affect the meaning or interpretation of the Plan

11.12 - **Notices.**    All notices, requests, demands, or other communications required or permitted in this Plan must be given in writing to the party(ies) to be notified. All communications will be deemed delivered when received at the following addresses:

a.      Bavaria Inn Restaurant, Inc.
        dba Shotgun Willies
        ATTN: Deborah Dunafon, President
        490 S. Colorado Blvd.
        Denver, CO 80246

        With a copy to:
        Jeffrey A. Weinman, Esq.
        Weinman & Associates, P.C.
        730 17th Street, Suite 240
        Denver, CO 80202-3506
        Fax: (303) 572-1011
        Email: jweinman@weinmanpc.com

b.      To an allowed claimant, at the addresses set forth in the allowed
        Proof of Claim, if filed, otherwise, at the address set forth for the

16

claimant in the Debtor's Schedules filed with the Court.

    c.    To the IRS, by fax to the attention of Troy Blair at (855) 716-0613, or to the attention of Sal Rivera at (855) 276-0907.

11.13 - **Unclaimed Payments**.  If a person or entity entitled to receive a payment or distribution pursuant to this Plan, exclusive of the IRS, fails to negotiate a check, accept a distribution or leave a forwarding address in the event notice cannot be provided as set forth in paragraph 14, within one (1) year of the Effective Date of the Plan, the person or entity is deemed to have released and abandoned any right to payment or distribution under the Plan.

11.14 - **Subchapter V Trustee and Plan Payments**.  If this Plan is confirmed pursuant to 11 U.S.C. § 1191(a), the Trustee's services shall be terminated at such time as the Plan has been substantially consummated.  If the Plan is confirmed pursuant to 11 U.S.C. § 1191(b), the Trustee shall continue to serve as Trustee, and shall accept Plan payments from the Debtor and convey said payments as provided herein.

11.15 - **Substantial Consummation**.  Pursuant to 11 U.S.C. § 1183(c)(2), within fourteen (14) days after the Plan has been substantially consummated, the Debtor shall file a notice of the same with the Court, and serve the Subchapter V trustee, the United States trustee, and all parties in interest.

**[remainder of page intentionally left blank]**

## XII.   **CONFIRMATION REQUEST**

The Debtor, as proponent of the Plan, requests confirmation of the Plan pursuant to 11 U.S.C. §1191(a).  The Court may confirm the Plan pursuant to § 1191(b) if it does not discriminate unfairly and is fair and equitable with respect to each class of Claims or Interests that is impaired under, and has not accepted, the Plan.


DATED:  February 16, 2021          **BAVARIA INN RESTAURANT, INC.**

                                   By: *s/ Deborah Dunafon*
                                        Deborah Dunafon, President

APPROVED AS TO FORM:

*s/ Jeffrey A. Weinman*
Jeffrey A. Weinman, #7605
Weinman & Associates, P.C.
730 17th Street, Suite 240
Denver, CO 80202-3506
Telephone: (303) 572-1010
Fax: (303) 572-1011
Email: jweinman@weinmanpc.com

ATTORNEY FOR BAVARIA INN RESTAURANT, INC.,
DEBTOR-IN-POSSESSION

18

# APPENDIX A

## DEFINITIONS

Administrative Claim shall mean a Claim for payment of an administrative expense of a kind specified in § 503(b) or 1114(e)(2) of the Bankruptcy Code and entitled to priority pursuant to § 507(a)(2) of the Bankruptcy Code, including, but not limited to: (a) the actual, necessary costs and expenses, incurred after the Petition Date, of preserving the estate and operating the business of the Debtor, including wages, salaries, or commissions for services rendered after the commencement of the Chapter 11 Case; (b) Professional Fee Claims; (c) all fees and charges assessed against the estates under 28 U.S.C. § 1930; and (d) all Allowed Claims that are entitled to be treated as Administrative Claims pursuant to a Final Order of the Bankruptcy Court under § 546(c)(2) of the Bankruptcy Code.

Allowed Claim shall mean a claim in respect of which a Proof of Claim has been filed with the Court within the applicable time period of limitation fixed by Court Order in this case or scheduled in the list of creditors prepared and filed with the Court pursuant to Bankruptcy Rule 1007(b) and not listed as disputed, contingent or unliquidated as to amount, in either case as to which no timely objection to the allowance thereof has been filed pursuant to Bankruptcy Rules 3001 and 3007 or as to which any such objection has been determined by a Final Order.

Allowed Secured Claim shall mean an allowed claim secured by a lien, security interest or other charge against or interest in property in which the Debtor has an interest, or which is subject to setoff under § 553 of the Code, to the extent of the value (determined in accordance with § 506(a) of the Code) of the interest of the holder of any such allowed claim and the Debtor's interest in such property or to the extent of the amount subject to such setoff as the case may be.

Avoidance Actions means each Debtor's estate's interest in any and all Claims, rights and causes of action which have been or may be commenced by or

19

on behalf of the Debtor to avoid and recover any transfers of property determined to be preferential, fraudulent or otherwise avoidable pursuant to §§ 544, 545, 547, 548, 549, 550 or 553 of the Bankruptcy Code, or under any other applicable law, or otherwise subject to equitable subordination under §510 of the Bankruptcy Code, regardless of whether or not such actions have been commenced prior to the Effective Date.

Citywide Banks shall mean the lender to the Debtor in the amount of $1,957,288, and which has a first priority security interest in substantially all of the assets of the Debtor.

Claim shall mean any right to payment, or right to any equitable remedy for breach of performance if such breach gives rise to the right to payment, against the Debtor in existence on or as of the Petition Date, whether or not such right to payment or right to an equitable remedy is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, secured or unsecured.

Class shall mean any Class into which Allowed Claims are classified pursuant to Article III.

Class 1-8 and Claims and Interests shall mean the Allowed Claims and Interests so classified in Part III.

Coal Creek Partners, LLC shall mean Debtor's landlord.

Code shall mean the Bankruptcy Code, 11 U.S.C. § 101 *et seq.* and any amendments thereof.

Confirmation Date shall mean the date upon which the Order of Confirmation is entered by the Court.

Confirmation Order shall mean the Order entered by the Court confirming the Plan in accordance with the provisions of Chapter 11 of the Code.

Court shall mean the United States Bankruptcy Court for the District of Colorado in which the Debtor's Chapter 11 case is pending, pursuant to which this Plan is proposed, and any Court having competent jurisdiction to hear appeal or certiorari proceedings therefrom.

Discounted Present Value shall mean the value as of the Confirmation Date of the projected cash flow of the Debtor for the five (5) years following confirmation and which will be paid to creditors.

Disputed Claim shall mean any Claim which is not an Allowed Claim, including, without limitation, any Claim designated as disputed, contingent or unliquidated in Debtor's schedules filed in connection with this case, or any Claim against which an objection to the allowance thereof has been interposed, and as to which no Final Order has been entered.

Effective Date for Secured Creditors shall mean thirty (30) days following the date the Confirmation Order becomes a Final Order. The estimated Effective Date is July 1, 2021.

Effective Date for Unsecured Creditors shall mean thirty (30) days following that date when all of the Litigation Claims are resolved by a judgment which becomes a Final Order or a settlement is reached and approved by a Final Order of the Bankruptcy Court. The Effective Date for Unsecured Creditors is therefore unknown.

Final Order shall mean an Order or a Judgment as to which the time to seek certiorari, appeal, review or a hearing has expired and as to which no writ of certiorari, appeal or petition for review or a hearing or rehearing is pending.

Litigation Claims shall mean claims of all of the Plaintiffs in the following state court actions incorporated herein as listed on the attached Exhibit 4.

Petition Date shall mean the date on which the voluntary petition was filed by the Debtor on November 18, 2020.

Plan shall mean this Plan of Reorganization, as amended in accordance with the terms hereof or modified in accordance with the Code, including all exhibits and schedules attached hereto or referenced herein or therein.

Plan Payment Fund shall mean the bank account into which will be deposited $865,000 on the Effective Date for Secured Creditors, which account shall be governed by the requirements of 11 USC Sec 345. This amount shall be the Discounted Present Value of the projected five year income stream derived from Debtor's post-confirmation operations. The account shall be

21

escrowed and segregated from all other accounts held or created by Debtor and no funds shall be distributed from the account until further order of the Bankruptcy Court. Once all Litigation Claims are allowed or disallowed by a Final Order, the entirety of the Unsecured Creditors in all classes will be known and a pro rata distribution can be calculated and distributions made to all allowed Unsecured Claims. Until such time as all Litigation claims are determined by a Final Order or a settlement approved by a Final Order of the Bankruptcy Court, the Plan Payment Fund will accrue interest and remain segregated.

Priority Claim shall mean any pre-petition Claim entitled to a priority in payment under § 507(a) of the Code, but shall not include any Administrative Claim or Tax Claim.

Professional Fees shall mean the Administrative Claims for compensation and reimbursement submitted pursuant to Section 330, 331 and 503(b) of the Code by a Professional Person.

Rules shall mean the Federal Rules of Bankruptcy Procedure and Local Bankruptcy Rules for the District of Colorado as adopted by the Court.

SBA shall mean the lender to the Debtor in the amount of $150,000 for an EIDL loan and which has a second position security interest in substantially all of the assets of the Debtor.

Tax Claim shall mean any unsecured Claim of a governmental unit for taxes entitled to priority pursuant to 11 U.S.C. § 507(a)(8).

Unclassified Priority Claims shall mean Claims pursuant to Section 507(a)(2) which are Administrative Claims allowed under Section 503(b) of the Code and any fees and charges against the estate under Chapter 123 of Title 28 of the United States Code and shall further mean Allowed Unsecured Claims of governmental units to the extent provided for in Section 507(a)(8) of the Code.

Other Definitions.  Unless the context otherwise requires, any capitalized term used and not defined herein or elsewhere in the Plan but that is defined in the Code or Rules shall have the meaning set forth therein.

22

**EXHIBIT 1**

**CASH FLOW PROJECTIONS**

See Cash Flow Projections attached.

**EXHIBIT 2**

**LIQUIDATION ANALYSIS**

See Liquidation Analysis attached.

**EXHIBIT 3**

**UNSECURED CREDITORS**

See List of Unsecured Creditors attached.

**EXHIBIT 4**

**PRE-PETITION LITIGATION**

See List of Pre-Petition Litigation attached.

**EXHIBIT 5**

**RANGE OF RECOVERIES FOR CLASSES 3 THROUGH 6**
**BASED UPON VARIOUS ASSUMPTIONS RELATING TO THE LITIGATION CLAIMS**

See attached.