## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| In re: | ) |
| | ) |
| BAVARIA INN RESTAURANT, INC. | )   Case No. 20-17488 EEB |
| | )   Chapter 11 |
| Debtor. | ) |

### OBJECTION TO CONFIRMATION OF PLAN OF REORGANIZATION

Creditors and parties-in-interest, Dory E. Wright, surviving spouse and as the personal representative of the estate of Randall C. Wright, and D.A. Wright and D.E. Wright, the surviving biological children of Randall C. Wright (together, the "Wrights"), by and through their undersigned counsel, hereby object to the Plan of Reorganization for Small Business Under Chapter 11, Subchapter V (the "Plan") and in support, state as follows:

### I.  INTRODUCTION

1. Bavaria Inn Restaurant, Inc. d/b/a Shotgun Willie's ("Debtor") filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") on November 18, 2020 (the "Petition Date").

2. Debtor filed its *Plan of Reorganization for Small Business Under Chapter 11, Subchapter V* (the "Plan") on February 16, 2021 (docket no. 97).

3. The Wrights object to confirmation of the Plan for the reasons that follow.

### II.  BACKGROUND

A.  Mr. Wright's Death and the Wrongful Death Lawsuit

4. The wrongful actions of one of the Debtor's employees, together with the wrongful actions of Debtor itself, caused the death of Randall C. Wright ("Mr. Wright") on or about May 2, 2019. In summary, the Debtor's employee, Derek T. Hendricks ("Hendricks"), tackled and physically restrained Mr. Wright crushing his airway and causing Mr. Wright to die of "mechanical/restraint asphyxia." Mr. Wright was a successful executive with Kroger and is survived by his wife and two young sons.

5. On October 11, 2019, the Wrights initiated a wrongful death lawsuit in Colorado state court (the "State Court") against the Debtor and Hendricks in a case styled *Dory E. Wright, surviving spouse, and as the Personal Representative of the Estate of Randall C. Wright; D.A. Wright, surviving biological child; and D.E. Wright, surviving biological child*, v. *Bavaria Inn Restaurant, Inc. d/b/a Shotgun Willie's, a Colorado Corporation, and Derek T. Hendricks, an*

*individual*, District Court, Arapahoe County, Colorado, case number 2019 CV 32418 (the "State Court Lawsuit"). The Wrights assert that their damages exceed the Debtor's insurance policy limits. A true and accurate copy of the original Complaint and Jury Demand filed in the State Court Lawsuit is attached hereto as **Exhibit A**.

B. The Debtor Attempts to Transfer its Assets to a Related Entity

6. Glendale Holdings, LLC ("GH") is a Colorado limited liability company formed or registered on August 7, 2019. The ownership structure and management structure of GH are essentially identical to that of the Debtor. Deborah Matthews a/k/a Deborah Dunafon ("Matthews") owns 53% of the shares or stock in the Debtor. Matthews caused GH to be organized and formed on August 7, 2019, just three months and five days after Mr. Wright's death.

7. Under the Operating Agreement of Glendale Holdings, LLC (the "Operating Agreement"):

    a. "[GH] is expressly set up and intended to have the membership interests in it distributed to the shareholders of [Debtor] in the same ownership interests they have in [Debtor]." Operating Agreement, ¶ D.

    b. "The initial Member of [GH] is [Debtor] […]." Operating Agreement, pg. 1.

    c. "The contribution of the initial Member will be the certain leased property, owned real and personal property and improvements thereon located at 490 South Colorado Blvd., Glendale, Arapahoe County, Colorado." Operating Agreement, pg. 2, Section II, ¶ 9.

    d. "The profits, losses and distributions of [GH] shall be allocated among the Members on the basis of their respective membership interests; initially one hundred (100%) to [Debtor]; and after the distribution to the SHW shareholders in the same percentage as the shareholders hold in [Debtor]." Operating Agreement, pg. 3, ¶ 13.

    e. "The Manager will distribute all of the Membership Interests in GH to the shareholders in [Debtor] based on their respective shareholder percentage in [Debtor]." Operating Agreement, pg. 4, Section IV, ¶ 21.

The Operating Agreement is signed by Bavaria Inn Restaurant, Inc., "Deborah M Dunafon, President" and by Glendale Holdings, LLC, "Deborah M. Dunafon, Manager." A true and accurate copy of the Operating Agreement of Glendale Holdings, LLC is attached hereto as **Exhibit B**.

8. Thus, at the inception of GH, the intent of the shareholders of SGW and Matthews was to create a new entity, transfer valuable assets from Debtor to GH, and then distribute the membership interest in GH to the shareholders of Debtor. The net result of the anticipated transactions would have been to leave GH and its shareholders with all of the most valuable assets of the Debtor without providing the Debtor with any real value in return.

9. In furtherance of the scheme, Debtor executed a Special Warranty Deed on January 2, 2020, which was recorded in the real property records of the Arapahoe County Clerk and Recorder on January 6, 2020, at reception number E0002012. A true and accurate copy of the Special Warranty Deed is attached hereto as **Exhibit C**. According to the Special Warranty Deed, Debtor conveyed certain property (the "Property") to GH in exchange for 100% of GH's membership interest. These are the same membership interests that Debtor conveyed (or was bound to convey) to its shareholders for no consideration.

10. Next, Debtor executed a Bill of Sale on January 2, 2020 which was recorded in the real property records of the Arapahoe County Clerk and Recorder on January 6, 2020, at reception number E0002013. A true and accurate copy of the Bill of Sale is attached hereto as **Exhibit D**. According to the Bill of Sale, Debtor conveyed to GH the improvements on the Property (the "Improvements") and any personal property or appurtenances thereto (the "Personal Property"). According to the Bill of Sale, Debtor conveyed the Improvements and Personal Property to GH in exchange for ten dollars.

11. The Wrights discovered the transfers during discovery in the State Court Lawsuit. On or about September 22, 2020, the Wrights filed a motion in the State Court seeking permission to add fraudulent transfer claims under C.R.S. § 38-8-101 *et seq*., Colorado's Uniform Fraudulent Transfer Act ("CUFTA"), against GH and Matthews.

12. In their response to the motion to amend and add Matthews as a defendant, the Debtor argued that the scheme to transfer property from the Debtor to GH was for undisclosed "tax purposes." Debtor also argued that the transfers were harmless because the Debtor remained the sole shareholder of GH, despite the clear obligation in the Operating Agreement of Glendale Holdings, LLC that the membership interests in GH be distributed to the shareholders of Debtor.

13. A hearing on the Wrights' motion to amend to add CUFTA claims with Matthews as an additional defendant was scheduled in the State Court for November 18, 2020 at 10:00 am. This bankruptcy case was filed at 8:56 am the morning of the hearing.

14. In response to question 13.2 of the Debtor's Statement of Financial Affairs, the Debtor asserts that the "premises building" was transferred from Debtor to GH on January 6, 2020 and from GH back to Debtor in November 2020. In response to question 13.3 of the Debtor's Statement of Financial Affairs, the Debtor asserts that "land lease" was transferred from Debtor to GH on January 6, 2020 and from GH back to Debtor in November 2020.

### III. ARGUMENT

A. The Debtor's Profitability and Lack of Timely Post-Petition Financial Reporting

15. After the Debtor's attempts to transfer its assets to another entity owned by the Debtor's shareholders failed, this bankruptcy was filed. However, the Debtor's efforts to hide its ability to pay the Wrights have not ceased.

16. On the Petition Date, the Debtor reports that it had $905,004.03 in petty cash and financial accounts, liquor inventory of $24,676.20, furniture fixtures and equipment of $48,000.00,

a building and improvements with a book value of $2,000,000.00, for a total of $3,070,052.61 in assets. The Debtor also reports that on the Petition Date it had secured debt of $2,107,288.00 and unsecured debt of $1,056,100.97, including alleged debts of $750,000.00 to Coal Creek Partners, LLC ("Coal Creek") and $112,335.34 to Mount Vernon Management, Inc. ("Mount Vernon"). Upon information and belief, Coal Creek and GH are owned by at least some of the same individuals that own the Debtor. Matthews is the signatory for all three entities. Any common owners between the Debtor and Mount Vernon, if any, are not disclosed in the Plan.

17. Since the Petition Date, the Debtor has filed only one Monthly Operating Report for Small Business Under Chapter 11 (the "MOR") for the time-period of November 18, 2020 – December 21, 2020 which was filed on February 3, 2021 (docket no. 84). The Debtor's monthly operating report for December 2020 was due on January 21, 2021, the report for January 2021 was due February 21, 2021, and the report for February 2021 was due on March 21, 2021.

18. Due to the Debtor's lack of required financial reporting and the inadequacy of the disclosures contained in the Plan, information regarding the Debtor's post-petition finances is meager. However, the sole existing MOR does disclose that through November 30, 2020, the Debtor generated net income before expenses of $3,413,611.47. The MOR also discloses that during the same time-period, the Debtor paid $418,865.76 to "Management," perhaps payments to Mt. Vernon or perhaps distributions to shareholders, $96,000.00 as "Corporate Officer Salary," $262,578.99 in legal expenses, and $750,000.00 in "Land Rent" to Coal Creek (which is confusing since the Plan refers to minimum monthly rent that was previously less than $25,000 per month). In response to question 4.4 of the Statement of Financial Affairs (docket no. 32) filed on December 1, 2020, the Debtor reports that through October 31, 2020, $558,000.00 was distributed to the Debtors' shareholders. Despite the COVID-19 pandemic and distributions of at least $558,000.00 to the Debtor's shareholders, the Debtor's net profits were only $181,575.03 in the red as of November 30, 2020. On page 8 of its Plan, Debtor states that it "was not insolvent during any relevant time period for the avoidance of transfers."

19. The limited information available belies the Debtor's exaggerated narrative regarding the negative impact of the pandemic (and ongoing litigation) on the Debtor's finances. It appears that even a partial reduction in distributions to shareholders would have resulted in a profitable 2020 for the Debtor.

B.  The Debtor's Convenient Discovery of Additional Debt to a Related Entity

20. Given the Debtor's ability to pay significant amounts to related entities and its shareholders during 2020 and the worst of the pandemic, the Debtor appears to have devised an additional strategy to make it appear that the Debtor is unable to satisfy the legitimate claims of its creditors.

21. The Debtor's Plan states that "during the course of performing due diligence in connection with investigating the Chapter 11 filing for Bavaria, counsel discovered that it had been miscalculating the escalator provision in the Lease." The Debtor goes on to state that Coal Creek (which is owned by at least some of the same individuals that own the Debtor) has calculated the arrearage at $3.3 million and that the Debtor estimates the rent miscalculation and arrearage to be $801,000.00. The Debtor reveals that a compromise has been reached and that monthly rent to

Coal Creek will be increased to $25,000.00 and Coal Creek will be allowed an unsecured claim of $801,000.00. The Debtor does not disclose the identities of the owners of Coal Creek or who represented Coal Creek in its "negotiations" with the Debtor. Neither does the Debtor explain whether the legal doctrines of waiver, laches, and/or estoppel apply to the claims of Coal Creek. At a minimum, the deal between the Debtor and Coal Creek should be subject to additional scrutiny given the common ownership of the two entities. "The case law clearly holds that when a debtor in possession seeks to settle a dispute with its parent company or with another related party, the court should give greater scrutiny than in the usual case." *In re Dow Corning Corp.*, 192 B.R. 415, 428 (Bankr. E.D. Mich. 1996).

22. The Debtor's past behavior and the fortuitous timing of the discovery of this additional debt to a related entity reveals a pattern of attempts to hinder the efforts of the Wrights to collect from the Debtor.

C. The Debtor's Dour Economic Forecast and Suspect Valuations

23. The Debtor's economic projections and asset valuations are extremely pessimistic in an attempt to justify the meager return it proposes to provide to unsecured creditors.

24. On page 4 of its Plan, the Debtor asserts that due to the COVID-19 pandemic, its 2020 revenues were $3.4 million, approximately one-half the prior six-year average. This indicates that its average sales prior to the pandemic were in the $7 million range (depending on whether sales trends were increasing, decreasing, or level year over year). Apparently using the anomalous 2020 sales revenue numbers as a baseline, the Debtor's Discounted Cash Flow Valuation Analysis attached to the Plan predicts sales of about $3.8 million in 2021 with only 7.5% sales growth for the first two years of the plan, 5% sales growth in 2023 and 2024, and 2.5% sales growth in 2025. The Debtor projects that even *five years* after the most devastating economic effects of the pandemic are expected to subside (and despite widespread vaccinations already well underway as of the date of this filing), the Debtor's annual sales will still be approximately $4 million, significantly less than in the years prior to the bankruptcy filing. This forecast is at odds with the views of most economic experts (and perhaps even the Debtor's sales data for the first quarter of 2021, had such data been provided as required). For instance, in an article published by Deloitte on its website on March 16, 2021 (which appears to be the basis for the information provided during his presentation at this year's Rocky Mountain Bankruptcy Conference), Daniel Bachman sets out three possible scenarios for a post-pandemic economic recovery.[1] In the most likely scenario, Mr. Bachman predicts moderate growth during the first half of 2021. As vaccinations reach a significant portion of the public by spring, activity in affected industries is expected to resume. This is expected to lead to robust economic growth in the second half of 2021 with a gradual tapering off over time. While it is possible that post-pandemic growth will be more slow than normal after 2021, the Debtor's forecast does not account for the unique nature of the current economic crisis and large bump in sales that is expected to happen during the second half of 2021. Instead, the Debtor's forecast predicts that sales will only slightly improve from pandemic levels year after year.

---

[1] https://www2.deloitte.com/us/en/insights/economy/us-economic-forecast/united-states-outlook-analysis.html, last retrieved on March 19, 2021.

25. There are other problems with the Debtor's Discounted Cash Flow Valuation Analysis. It is unclear whether the Debtor will actually participate in Colorado's 5 Star State Certification Program COVID-19 mitigation strategy and whether such costs will actually be incurred. The anticipated costs of participation in an undisclosed amount are included in the Debtor's projections. It is also unclear to what extent officers' compensation, management fees, and distributions to shareholders will be reduced as stated in the Debtor's projections. In short, the projections are overly simplistic and contain no supporting documents, reports, or analysis to support the assertions contained therein. Additionally, the Debtor's plan proposes to discount the anticipated $2.1 million in disposable income over five years to a present value of approximately $865,000.00, a figure which is only 41% of the forecasted profits. Stated another way, the Debtor has provided an unreasonably low projection and then further reduced the projected profits to a purported "present value" by discounting them nearly 60%.

26. The Debtor's liquidation analysis is also highly suspect given that it estimates the fair market value of the Debtor's business—a business that generated over $500,000.00 in profits to its shareholders during the pandemic, paid hundreds of thousands in management fees to a related entity during the pandemic, likely generated approximately $7 million in revenue per year in prior years, and which the Debtor characterizes as the "most successful gentlemen's club in the country"—at only slightly more than $1 million. Neither does the Plan disclose whether the Debtor's valuation expert complied with any accepted industry standards for his valuation services.

27. The Debtor also claims that the value of the building that it paid $3.1 million to build in 2013 is now only $2 million. On page 7 of the Plan, the Debtor asserts that the "value of these assets is book value based on liquidation value unless otherwise noted." This statement conflates two different valuation concepts which casts further doubt on the reliability of the data provided in the Plan.

E. The Plan Has Not Been Proposed in Good Faith

28. The Debtor's (a) attempt to wrongfully shield its assets from the Wrights prior to the Petition Date; (b) relative financial health; (c) overly pessimistic projections and valuations; (d) failure to provide required financial disclosures; and (e) additional problems with the Plan outlined below all demonstrate that the Debtor's bankruptcy is an attempt to use the COVID-19 pandemic as a smokescreen to limit the Debtor's liability in six pending lawsuits to a small portion of $865,381.00. The truth is that the Debtor is a profitable company that will likely recover quickly from the pandemic and has the financial wherewithal to provide a significantly higher return to unsecured creditors.

29. Pursuant to 11 U.S.C. §§ 1191(a) and 1129(a), the Plan must "be proposed in good faith." Under 11 U.S.C. § 1191(b) if all of the requirements of 1129(a) are satisfied, other than paragraphs (8), (10), and (15), the Court can confirm a plan so long as the "plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interest that is impaired under, and has not accepted the plan." The Wrights are the only creditors in Class 4 and have not accepted the Plan.

30. Because the Wrights hold an unsecured claim, the "fair and equitable" requirement is met if:

      a.    "The plan provides that the debtor's projected disposable income received in a three-year period, or such longer period not to exceed five years, is applied to make payments under the plan;

      b.    There is a reasonable likelihood the debtor can make all plan payments; and

      c.    The plan provides remedies to protect the holder of claims or interests if payments are not made."

*In re Ellingsworth Residential Cmty. Ass'n, Inc.*, No. 6:20-BK-01346-KSJ, 2020 WL 6122645, at *2 (Bankr. M.D. Fla. Oct. 16, 2020). In the 10th Circuit, the requirement of good faith has been evaluated using the following standard:

> In assessing good faith, "courts have looked to whether the debtor intended to abuse the judicial process and the purposes of the reorganization provisions." *Paige*, 685 F.3d at 1178; *Pikes Peak Water*, 779 F.2d at 1460.
>
> A standard such as "good faith" requires a court to assess the "totality of the circumstances." *Rocky Mountain Land*, 2014 WL 1338292 at *9. Put another way, in addition to assessing technical compliance with the Bankruptcy Code and feasibility, the court also should consider "whether a plan is proposed with honesty and sincerity" and "whether a plan's terms or the process used to seek its confirmation was fundamentally fair." *Riviera Drilling*, 2012 WL 6719591 at *5 (*citing In re Global Water Tech., Inc.*, 311 B.R. 896, 903 (Bankr.D.Colo.2004)).

*In re Autterson*, 547 B.R. 372, 399 (Bankr. D. Colo. 2016).

    31.    The Plan is not proposed in good faith and is not fair and equitable because (a) the Debtor has not provided the basic information required for creditors to evaluate the Plan, including the Debtor's failure to file at least three monthly operating reports; (b) it is based on overly gloomy projections and unreasonably low asset valuations; (c) it provides inadequate disclosures regarding the Debtor's projections and the amounts that are allocated to paying related entities, insiders, and shareholders in the projections; (d) the Debtor has not provided adequate assurances that the interests of creditors were adequately represented when it "negotiated" a resolution to the "dispute" between Coal Creek and the Debtor, two entities who share at least some common owners; and (e) the Debtor's pre-petition behavior and relative financial strength indicate that this bankruptcy was filed to coerce the Wrights into accepting an unfairly small settlement in the State Court Litigation.

    32.    In addition to the reasons outlined above, the Plan is not proposed in good faith and is not fair and equitable because it proposes to prevent creditors from participating in any upside should the Debtor's actual financial performance exceed its dour projections. As written, the Debtor's Plan proposes to pay unsecured creditors out of a pool of funds of $865,000.00 provided by Matthews representing the alleged present value of the Debtor's projected profits over five years. Thus, the Plan proposes to pay a fixed amount and does not provide for distribution of the Debtor's "disposable income." Neither does the Plan provide any remedies to protect the Wrights should the Debtor fail to make the required payment(s).

33. The Wrights believe that the Debtor's assets and business are worth much more than stated in the Plan and that the Plan fails to comply with the requirement of 11 U.S.C. § 1129(a)(7)(A)(ii) that the Wrights receive "property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date."

34. Finally, the classification scheme in the Plan unfairly discriminates against similarly situated tort claimants by placing them in unequal classes.

### IV. CONCLUSION

35. The Debtor's Plan should not be confirmed. It is not proposed in good faith and it is not fair and equitable. It undervalues the Debtor's assets and projected income, prefers related entities with questionable claims, unfairly discounts the already underestimated projected profits, and continues a pattern of wrongfully seeking to avoid paying the legitimate claims of the Wrights for the tragedy the Debtor caused to befall their family.

WHEREFORE, the Wrights respectfully request that the Court deny confirmation of the Debtors' Plan and grant the Wrights such other relief as deemed appropriate.

Dated this 24th day of March, 2021.

WADSWORTH GARBER WARNER CONRARDY, P.C.

/s/David J. Warner
David J. Warner, #38708
2580 West Main Street, Suite 200
Littleton, Colorado 80120
303-296-1999 / 303-296-7600 FAX
dwarner@wgwc-law.com
Attorneys for Dory E. Wright, surviving spouse and as the personal representative of the estate of Randall C. Wright, and D.A. Wright and D.E. Wright, the surviving biological children of Randall C. Wright