IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| IN RE: | ) |
| | ) Case No. 20-17488 EEB |
| Bavaria Inn Restaurant, Inc. | ) Chapter 11 |
| Debtors | ) |
| | ) |

**DEBTOR'S OBJECTION AND RESPONSE TO MOTION TO DISMISS BANKRUPTCY CASE PURSUANT TO 11 U.S.C. §§ 1112(b) AND 305(a)(1) OR TO REMOVE THE DEBTOR-IN-POSSESSION UNDER 11 U.S.C. § 1185(a)**

Bavaria Inn Restaurant, Inc. ("Debtor"), through its undersigned counsel, files its Objection and Response to the Motion to Dismiss Bankruptcy Case Pursuant to 11 U.S.C. §§ 1112(b) and 305(a)(1) or to Remove the Debtor-In-Possession under 11 U.S.C. § 1185(a) (the "Motion") filed by Dory E. Wright ("Movant") as follows:

## INTRODUCTION

Barely two months prior to the confirmation hearing on Debtor's proposed plan of reorganization, Movant has filed the Motion, for the most part, rehashing objections to confirmation - see Objection to Confirmation of Plan of Reorganization filed by D.A. Wright et al ("Wright") (Doc. No. 119) - perhaps hoping that if they are framed as a motion under § 1112, they will improve. They have not.

Movant approaches this case with a presumption to which Movant is not entitled: that Movant holds a valid claim for $5.6 million. While the Bankruptcy Code defines a person with disputed and unliquidated claim as a "creditor," it does not create any presumption about the validity or the amount of the disputed claim. The ultimate burden of persuasion remains with the claimant. *In re Brock*, 494 B.R. 534, 540 (Bankr. D. Colo. 2013).

Here, Mr. Wright, a 211 lb. pound man, made his way to Debtor's premises shortly after 10:00 pm in the evening of May 2, 2019, having consumed more than 12 drinks at other establishments and

1

who had a blood/alcohol level of 2.3, and within 30 minutes proceeded to pick a fight and physically assault another patron. The only person using a "choke hold" that night was Mr. Wright. Whether anyone is at fault for Mr. Wright's unfortunate subsequent death and whether Debtor is responsible for any damages and, if so how much, are matters a jury will decide in another forum. In the meantime, there is no presumption in this case that Movant is deserving of an allowed claim in any amount.

Movant seeks to create the impression that Debtor could expect claims of the amount Movant now asserts, such that the $2.0 million in liability insurance Debtor carried would be insufficient. But Debtor's business is basically a restaurant and bar with entertainment; its business presents no different risk profile than other restaurants and bars that stay open late. Nothing about its business as a strip club causes it to pose any greater risk to its patrons or give it any reason to expect the extraordinary results of the events of May 2, 2019.

Movant also approaches this case as if it were all about Movant's disputed claim and that the pandemic is merely a sideshow which did not materially affect Debtor. Debtor, however, was shut down for months at a time and was struggling to keep the business alive. Indeed, immediately after filing its petition, Debtor was forced to close its doors for another extended period. In many ways its particular business made its circumstances worse than other restaurants and bars. Movant also presumes that the business will assuredly return to "normal," i.e. that the pandemic will not only have no lasting effect, but no real effect even in the next few years. Particularly with a third of the adult population refusing vaccination, this is wishful thinking, already disproven by Debtor's own experience in attempting to reopen. At a minimum, this is a debate to be had at confirmation, just like in any other case in which the Court must adjudicate projected income.

Movant has moved to dismiss this Subchapter V chapter 11 case as a bad faith filing. While Movant also suggests this Court should abstain or remove the debtor under § 1185, these requests are not based on any different arguments. Rather they are only alternative remedies and Debtor will treat them as such.

## ARGUMENT

**This Case Was Not Filed in Bad Faith**

The simple undisputed facts rebut Movant's claim of a bad faith filing without the need to address the "laundry list 'of factors to which courts have referred in evaluating whether a case has been filed in bad faith. Whether Movant's claim of $5.6 million is ultimately sustained, reduced or eliminated, it is a claim for $5.6 million. Movant certainly does not concede it is one dime less than that. Movant does not, and indeed cannot, argue that Debtor has the ability to pay a claim of that size should it be allowed, even if Debtor did not also face a pandemic that caused it to close its doors for months at a time and still prevents continuous operations today. In reaction to these two irrefutable problems, Debtor filed a chapter 11 case to deal with them. Movant's argument seems to be that Debtor is acting in bad faith by having the temerity to file before Movant has had the chance to convince a jury of the correctness of the claims, and, if successful, to then force Debtor's liquidation. This is the core of Movant's argument: that the case should be dismissed to wait and see if Movant gains the power to decide if Debtor survives or not. No case supports such an approach. For that reason alone, Movant's assertion that this chapter 11 filing was anything but the proper invocation of the Code fails at the outset.

It is not bad faith for Debtor to use the tools provided by Congress to meet an existing crisis – the pandemic – and the potential future crisis that would result if Movant's claim is allowed for amounts materially in excess of insurance coverage – proactively instead of reactively. Were that not the case, every chapter 11 filed to deal with future expected but unliquidated and disputed claims, e.g. almost all mass tort cases, would have to be dismissed until all the claims were liquidated. Moreover, in

enacting Subchapter V, Congress sought to make it easier for qualified debtors to reorganize and avoid liquidation. In doing so, Congress removed a number of roadblocks that might have prevented confirmation under regular chapter 11. In the face of a potential claim that threatens its ability to maintain its existence, Debtor here has proposed a plan that squarely complies with what Subchapter V requires. It is not bad faith for Debtor to do so simply because Movant finds the results authorized by Congress to be unpalatable.

**The "Laundry List"**

  **Prepetition Conduct**

Movant focuses on the laundry list of 14 factors set out in cases like *In re Bovino*, 496 B.R. 492, 499 (Bankr. N.D. Ill. 2013) and *In re RHA Stroud, Inc.*, No. 20-13482-SAH, 2020 WL 7787034, at *14 (Bankr. W.D. Okla. Dec. 30, 2020). The factor on which she places the most emphasis is whether there has been improper prepetition conduct by debtor. Movant argues at length that Debtor's proposed restructuring of its ownership for tax purposes constituted an attempt to hinder, delay or defraud Movant, even though Movant admits that the restructuring plan may have been underway before Mr. Wright appeared in the bar on May 2, 2019. Motion at ¶22. Although as rhetorical flourish Movant states that Debtor got "caught" making the supposedly wrongful transfers, Movant is forced to admit that Debtor *affirmatively disclosed* them to Movant in the prepetition course of the litigation, hardly the act of a debtor intent on fraudulent activity. See Motion ¶ 10. Whether the restructuring was in fact wrongful at all, or rather the transfer of a fully encumbered asset (the improved building) in which Debtor held only an interest as a tenant, or whether the description of the discussion about the transfer that Movant relates in ¶10 of the Motion is materially incomplete (Debtor asserts not only that its counsel offered at the time to unwind the transfer of the building because it had no net value, but that Movant's response was that Movant would be happy to own the building in order to drive Debtor out of business[1]) is an irrelevant sideshow

---

[1] It is perhaps fitting that Wright quotes as an authoritative source not a court or a known authority, but an unknown pundit who declares on his website that "We are the 'squeezebloodfromturnip.com' attorneys."

4

to a bad faith analysis because Debtor voluntarily unwound the transaction before filing this chapter 11 case. To be relevant, the prepetition conduct must tend to show that the petition was filed "to abuse the purposes of the Bankruptcy Code." *In re RHA Stroud, Inc.*, No. 20-13482-SAH, 2020 WL 7787034, at *33 (Bankr. W.D. Okla. Dec. 30, 2020), citing *Winslow v. Williams Group (In re Winslow) 949 F.2d 401 (10th Cir. 1991)*. The supposedly avoidable transfers of which Movant complains are unrelated to whether Debtor's petition is somehow an abuse of the Code. If anything, Debtor's prepetition acts demonstrate the exact opposite: Debtor ensured without cost or delay to the creditors that the bankruptcy estate would own the assets Movant claims Debtor tried to convey away.

Movant's argument for "abuse" centers around the contention that Debtor filed its petition to "coerce" Movant into settling for inadequate insurance limits – a mere $2.0 million. The facts are to the contrary. Under Debtor's proposed Plan, Movant is entitled to liquidate the claims in state court to the fullest extent possible; Movant is not bound to settle at all. If by "coerce," Movant is referring to "cramdown," that is nothing more than the Code allows: payment based on projected disposable income. Movant's real complaint is based on the belief that Debtor should provide a greater return. This is not coercion, any more than Movant's existential threat of a $5.6 million claim is an attempt to coerce Debtor into an unreasonably high settlement for fear of having its business destroyed. Rather, the parties have competing views, not only about whether Movant's claim is allowable and in what amount (which Movant is entitled to have a jury decide), but about a highly uncertain economic environment for an industry whose future performance is particularly sensitive to the problems and changes created by the pandemic. In particular, Debtor's projections of future performance are informed by the opinion of its independent expert, Scott Salzman, not merely its subjective assessments, and at confirmation, this Court will be able to determine which expert view holds sway. In the meantime, Movant should not be allowed to turn a battle of the experts into something it is not: evidence of bad faith.

**Debtor Did Not Make Impermissible Prepetition Payments to Insiders**

Movant's claim that Debtor paid dividends to insiders while insolvent during the year before the petition is either misleading or downright false. First, Movant claims that the dividends that Debtor reported were paid throughout the year covered by Debtor's initial report (October 2019 through October 2020) when in fact they were all paid prior to March 2020, i.e. before the pandemic. The dividends were paid when Debtor was fully operating and making significant profits. No dividends have been paid since.

Second, Movant makes no colorable argument that Debtor was insolvent or had unreasonably small capital preceding the pandemic when these dividends were paid. To the contrary, Movant contends that Debtor was doing exceedingly well financially and was worth far more than today. Accordingly, Debtor had every reason to believe that, especially with $2.0 million in insurance coverage, the dividends did not either create insolvency or create an unreasonable risk of insolvency. See *CB Richard Ellis, Inc. v. CLGP, LLC*, 251 P.3d 523 (Colo. Ct. App. 2010). In any event, Movant's allegation that Debtor was insolvent or made insolvent by these pre-pandemic payments has no basis.

Movant also contends that payments to Ms. Mathews and her management company of $385,000 during the 12 months prepetition are somehow improper even though Ms. Mathews in fact manages Debtor. Debtor is prepared to demonstrate that the amount of the fees are below market for management of similar establishments according to Debtor's expert. Movant's use of adjectives and adverbs is simply not a substitute for evidence.

**Whether Debtor Has Few Unsecured Creditors; Whether Debtor Owes Few Debts to Non-moving Creditors**

Movant claims that Debtor has few unsecured creditors and asserts that Debtor had $1.0 million in cash on the filing date. Movant overlooks the pandemic and the fact that Debtor could not forecast when it could reopen on a consistent basis. It had both lease obligations and had guaranteed the debt to Citywide Bank of about $2.0 million. If the lease was not paid, Debtor's premises could be foreclosed.

Since the petition date, Debtor has been able to operate sporadically to mitigate its losses, but its cash still dropped $400,000 by the end of April 2021.

The number of creditors, however, loses relevance on whether the petition was filed for some abusive purpose if one of the few creditors holds a potential claim large enough to destroy the business.

**Whether the Case Essentially Involves Resolution of a Two-Party Dispute**

Movant's contention that this chapter 11 case is a "two party dispute" fails to recognize the reason this factor is sometimes considered in the bad faith analysis. The circumstance that supports dismissal is when the purpose of the filing is to create a bankruptcy forum for resolution of a single dispute and no reorganization purpose is intended. See, e.g. *In re Stingfree Techs., Inc.*, No. 08-16232bf, 2009 Bankr. LEXIS 3023, at *31 (Bankr. E.D. Pa. Feb. 4, 2009). As the 9th Circuit BAP noted, the "typical bad faith two-party dispute cases may involve delays on the eve of trial (litigation tactics), forum shopping, new-debtor syndrome (special purpose entities), repeat filers, and repeatedly delayed foreclosure sales." *Sullivan v. Harnisch (In re Sullivan)*, 522 B.R. 604, 616 (B.A.P. 9th Cir. 2014). None of these situations apply in Debtor's case. Pointedly, if "execution by one judgment creditor will put a debtor out of business, the debtor has a legitimate interest in protecting the rights of other creditors, as well as its own right to continue in existence for the sake of its employees and investors."
*In re Surgical Assocs.*, No. 13-10081-R, 2013 Bankr. LEXIS 1070, at *12-13 (Bankr. N.D. Okla. Mar. 21, 2013). Movant cannot deny that if the $5.6 million judgment that Movant asserts is allowed, it is appropriate for Debtor to protect its own right to continue in existence. It is not bad faith that Debtor did not take the chance of waiting until the judgment is entered to do so.

**Whether the Petition Was Filed on the Eve of Foreclosure or the Equivalent**

Movant's attempt to fit the situation into this factor is easily rebutted. Movant complains that the chapter 11 case was filed only one hour before a hearing on the Movants 'motion to amend the state court complaint to add CUFTA claims against the Debtor and Matthews, and only 15 days before the deposition of Debtor was scheduled to take place. Movant offers no explanation why Debtor would take drastic measures to delay or avoid

7

these benign ordinary course litigation events (in contrast to situations like an impending trial or a hearing on sanctions).

### Whether Debtor's Income Is Insufficient to Allow It to Operate

Movant complains that the fact that Debtor had sufficient income to fund its operations indicates bad faith. Debtor cannot locate a case discussing this factor but Debtor suggests Movant has it backwards anyway. It could be bad faith for a Debtor to retreat into chapter 11 when it did not have the ability to continue operations because its case would then be doomed to failure (unless it was seeking liquidation). Debtors with an honest intention to reorganize should only file if they can continue to operate. Here, Debtor made sure it had the reserves necessary to ensure survival even though the pandemic prevented continuous operations, which is evidence of Debtor's good faith and an honest desire to reorganize.

### Whether the Petition Was Filed Despite Lack of Pressure from Non-Moving Creditors

This factor appears to be a variation of the "two party" dispute consideration. As noted, while Movant may have been the only creditor putting pressure on Debtor, Movant's potential claim is an existential threat to Debtor.[2]

### Post Petition Conduct – The Lease Settlement

In her attempt to find some post-petition misconduct, Movant comes up with only three circumstances. The first concerns an email from Debtor's counsel to the subchapter V trustee in which Debtor asserts that Debtor's business was closed for 6 days in April due to a COVID-19 outbreak among the employees and not due to "construction/remodeling" as it reported in its monthly operating report. Motion at ¶41. Movant overlooks that both statements could be, and in fact were, true. Operations were closed due to a Covid-19 outbreak. Since operations were closed, Debtor chose to use the closure to some advantage and accomplish the remodeling while shut down anyway. Far from being evidence of untrustworthiness, Debtor's reference to the remodeling in its public document was more palatable than impairing the business by publicizing the outbreak.

---

[2] Debtor does not argue that the dispute over its lease was a factor in its decision to file.

Movant also tries to construe the same email as yet another supposed bad faith attempt to "coerce" Movant into consenting to the Debtor's Plan, claiming that *Debtor* will not make income available unless the questionable claim of Coal Creek is allowed to significantly dilute the claims of legitimate unsecured creditors. As addressed in more detail below, this argument is based on a legal fallacy. Debtor and its landlord Coal Creek are separate entities and their ownership is not identical in significant part. Debtor cannot cause Coal Creek to do anything. The fact that Coal Creek is a statutory insider may invite closer scrutiny of its dealings with Debtor, but nothing in the Code suggests that Coal Creek leaves its independent legal rights at the door. Movant's contention is nothing less than that the Code imposes on Debtor's management a duty to use its potential management of Coal Creek to run roughshod over the rights of no less that 25% of the owners of Coal Creek in order to favor Debtor.[3]

Overlapping ownership does not mean that the common owners are necessarily aligned on one side or the other. Different owners have different percentages in each entity, but even a person with the same relative percentage in each may find it more advantageous to derive income from one entity rather than the other. Some owners of Coal Creek may prefer a larger upfront payment of the cure amount while others may prefer payment over time. Colorado law does not give management of either entity the freedom to do whatever they want. Debtor is a Colorado corporation. Its officers and directors are required to discharge their duties (a) in good faith; (b) with care; and (c) in a manner the director or officer reasonably believes to be in the best interests of the corporation. C.R.S. § 7-108-401(1). Coal Creek is a manager-managed Colorado limited liability company. A manager must "refrain from dealing with the limited liability company in the conduct or winding up of the limited liability company business as or on behalf of a party having an interest adverse to the limited liability company." C.R.S. § 7-80-404(1)(b). Coal Creek's Operating Agreement does not modify this duty. The representatives of each entity are thus constrained to act for the interests of the entity they represent. As to the Lease dispute, Ms. Mathews, as

---

[3] Debtor also suggests that this Court consider whether permitting a party like Wright to cavalierly utilize plan (and other) settlement negotiations as evidence notwithstanding FRE 408 is good policy. FRE 408's purpose is, in order to facilitate settlements, to permit parties to have candid discussions, even heated argument, without fear that their words will be used against them in some other context. If a party is permitted to use those protected negotiations as a sword like Wright does here, parties in a chapter 11 will simply stop negotiating consensual plans and let the court settle all the differences.

manager of Coal Creek, could not make decisions without violating C.R.S. § 7-80-404(1)(b). As a result, she resigned, George Miller was appointed manager of Coal Creek, and Coal Creek retained its own counsel. Mr. Miller was not free to ignore the economic benefit that enforcement of the Lease escalation clause would provide Coal Creeks 'members. Thus, once the Lease terms came to light, the parties were required to deal with them since ignoring them would breach their duties to their respective entity and the other owners. When they did undertake to resolve the issue, they were also required to act consistent with Colorado law.

The fact is, Debtor and Coal Creek have timely and fully disclosed the dispute and its genesis, as well as the proposed resolution of the dispute, by motion to the Court, subject to whatever level of scrutiny is appropriate. Movant may not like the terms of the proposed resolution and may be frustrated that another creditor actually has rights here but that does not mean the resolution was proposed in bad faith.

The proposed Plan embodies a settlement of the dispute over the Lease's terms, including the terms for cure. The dispute between Debtor and its landlord centers around differing interpretations of the Lease's rent escalation clause. Paragraph 5 of the Lease unambiguously provides for an annual increase in the "Base Rent" of the greater of (a) 2%; (b) the CPI for the preceding lease year; or (c) 2% of Debtor's "Total Income." The issue is whether the increase is a separate number calculated annually and added to a constant Base Rent of $8500 per month (the original "Base Rent" amount starting January 2013) or whether the annual increase resets the "Base Rent" to the new increased number each year. The Lease provides that Base Rent "will be adjusted annually in accordance with the provisions of Paragraph 5." Paragraph 5 states that "the Base Rent shall be increased…" The Lease does not state that each year Debtor shall pay the Base Rent plus an amount equal to the number calculated pursuant to Paragraph 5. A plain meaning interpretation leads to the conclusion that "Base Rent" changes annually, and the escalator clause thus modifies the amount of last year's Base Rent, not the original Base Rent of $8500. The result would be that Debtor owes Coal Creek about $3.34 million.

Debtor maintains that the Lease should be interpreted to mean that the Base Rent is always $8500 and the additional amount calculated under paragraph 5 only increases the $8500 for the particular year. Under this interpretation, Debtor owes Coal Creek about $801,000.[4]

Under the Plan , the monthly Base Rent would be reset at $25,000 and would remain constant for purposes of calculating the additional amount of rent each year from now on, i.e. Debtor's interpretation but applied to the reset monthly base rent. Coal Creek agrees to Debtor's cure figure, but will not treat it as such, but rather will accept it as a general unsecured claim. The compromise is tied to confirmation of the Plan as proposed. This proposed settlement is to be evaluated pursuant to the same standards for approving settlements generally. *In re Nutritional Sourcing Corp.*, 398 B.R. 816, 832 (Bankr. D. Del. 2008)(standard for approving settlement in plan of reorganization same as other settlements). The Tenth Circuit subscribes to the generally-accepted test: (1) the probability of success in litigation, (2) the likely difficulties in collection, (3) the complexity of the litigation involved and the expense, inconvenience and delay necessarily attending it, and (4) the paramount interest of the creditors. *In re Edwards*, No. 91-2139, 1992 U.S. App. LEXIS 7606, at *6 (10th Cir. Apr. 20, 1992). In making the evaluation, the Court is not required to hold a mini-trial or decide the underlying dispute. Rather, the Court is to "canvass the issues and see whether the settlement 'falls below the lowest point in the range of reasonableness.'" *10 Collier on Bankruptcy P 9019.02* (16th 2021); *In re Stewart*, 603 B.R. 138, 147 (Bankr. W.D. Okla. 2019). The settlement is evaluated below.

### *The Four Factors*

Probability of Success: The first of four factors to be considered, the probability of success in litigation, requires examination on two fronts: the respective merits of the Lease interpretation arguments, and

---

[4] Creditor can easily perform the cure calculations. Line 6 of IRS form 1120S is Debtor's gross income. The Plan projects gross income at roughly $3.5 to $4.0 million per year. The Objectors already know that these projections are below prepetition pandemic performance. Using a higher figure then of $6.0 million a year for gross income means that Debtor failed to pay $120,000[4] of rent each year since 2014 for a total unpaid of $840,000. Adding the $120,000 per year to the base rent, i.e. Coal Creek's formula, is equally simple: 2013 would be even; 2014 rent would be $222,000 ($102,000 plus $120,000), only $102,000 of which was paid ($8500 times 12); 2015 would be total rent of $344,000 ($222,000 plus $120,000), only $102,000 of which was paid, etc.

11

whether Debtor has any other defenses to enforcement of the escalation provision. As to the interpretation of the Lease, the plain meaning of the Lease favors Coal Creek. Colorado courts "construe the language in harmony with the plain and generally accepted meaning of the words employed." *Chandler-McPhail v. Duffey,* 194 P.3d 434, 437 (Colo. App. 2008).

Movant has contended that perhaps Debtor has a viable waiver, estoppel or laches defenses, but no evidence supports a claim that Coal Creek intentionally relinquished a known right. Typically, this would be a specific statement from Coal Creek promising not enforce the Lease provision; there is none here. Estoppel requires that Debtor change its position in reliance on Coal Creek's action or non-action. Movant does not suggest what this change of position might be. Laches is an affirmative defense to a contract claim where the enforcing party had full knowledge of the facts, unreasonably delayed enforcement of its rights, and caused damages to the other party by its reliance. *Hickerson v. Vessels,* 316 P.3d 620 (Colo. 2014). Here, neither the landlord nor the tenant were aware of the mistaken calculation until a short time before this case was filed. Coal Creek made no misrepresentations to Debtor, and it is not unjust, much less "manifestly" so, if the tenant pays what it owes.

<u>Likely difficulties in collection</u>: this factor is not an issue for Debtor, but its cousin is the risk of loss to Debtor if Coal Creek prevails. At that point, if Debtor desires to stay in business, it may be forced to cede every bit of excess cash to its landlord.

<u>The complexity of the litigation involved and the expense, inconvenience and delay necessarily attending it</u>: The interpretation of the Lease requires going back eight years to 2013. The cost and inconvenience of litigating fact intensive theories of waiver, estoppel and laches with such a questionable chance of success makes litigation an unattractive option. The case would also not go to trial quickly and would delay this chapter 11 case by many months. Even then, the results could require a new negotiation between Debtor and Coal Creek, with a new plan, a new vote and a new round of dispute with Movant.

<u>The paramount interest of the creditors</u>: resolution of the Lease is central to Debtor's survival, and Debtor's survival is central to any recovery for unsecured creditors, including Movant if a claim of greater

than the $2.0 million insurance coverage is awarded. Coal Creek has tied its consent to the settlement to confirmation of the Plan as it stands. This is only natural: if general creditors are going to get a larger piece of the pie than the Plan calls for, Coal Creek has made it known it wants a greater share too. If Coal Creek prevails, it holds the power to demand an amount that ensures no unsecured creditor is paid. If no negotiated settlement could be reached, Debtor would be liquidated. While Movant claims the business could be sold, Movant forgets that a sale is impossible unless the Lease is assumed and assigned, and that, in turn, requires resolution of the Lease dispute at a minimum in Debtor's favor. Even if Debtor's interpretation holds sway, the cure number is significant.

The settlement is eminently reasonable. It takes Debtor's cure figure and does not require that it be paid under § 365, but rather treats is as a general unsecured claim. Debtor's rent would be reset to $25,000, which Debtor's expert realtor will testify is in the middle of what can be expected as fair market rental value. The proposed settlement avoids costly and prolonged litigation, reduces financial risk to Debtor and its creditors, and permits Debtor to reorganize with conservative financials. As such, it falls well within the range of reasonable.

Movant complains that the discovery of the Lease dispute is suspicious, but does not suggest that the escalator clause was not in the Lease at all times. Moreover, Debtor has been transparent about when and how the issue with the Lease provision was raised. Debtor even described the issues in its initial status report to this Court. Debtor's evidence will show that both Debtor and Coal Creek failed to focus on the provision and not that they knew about it but agreed to ignore it.[5]

---

[5] Movant also raises a discovery dispute in the Motion as evidence of bad faith. Coal Creek and Debtor raised the possibility of a potential joint interest privilege. In the Motion, Movant neglects to mention that while the parties reserved their rights, they did not withhold any document based on the possible privilege. This "tempest in a teapot" is not evidence of anything. In any event, since the Motion was filed, Movant's counsel has alerted that Court that any discovery dispute has been resolved.

**Debtor's Plan Does not Prefer Insiders and Related Entities Over the Interests of Creditors**

Movant's entire argument that the proposed Plan impermissibly prefers insiders is premised on the *opinions* of Movant's expert endorsed in connection with the hearing on confirmation. Debtor has endorsed Scott Salzman, a well-qualified well-respected independent expert with very different opinions. These are economic market-based issues to be decided at confirmation, not indicators of bad faith. Movant has done nothing more than make its closing argument on confirmation two months in advance.

Needless to say, most of the factors that lead to a bad faith filing conclusion are missing here, including: no previous bankruptcy filing by debtor or related entity; whether the petition effectively allows debtor to evade court orders; whether the petition was filed on eve of foreclosure; whether foreclosed property is the sole or major asset of debtor; whether the debtor lacks any ongoing business or employees; whether there is no possibility of reorganizing; whether the debtor is corporation that was formed and received title to its major assets immediately before petition was filed; and whether the petition was filed solely to create the automatic stay.

**The Debtor Should Not be Removed as Debtor in Possession**

Though Movant claims to have demonstrated substantial and convincing evidence of fraud, dishonesty and gross mismanagement, the Motion does nothing of the sort. Movant's argument for fraud is based on prepetition transfers that Debtor not only did not conceal but affirmatively disclosed to Movant, and then reversed voluntarily. Movant's complaint about impermissible dividends is based on a willful misreading of Debtor's own reporting. Debtor has fully disclosed the Lease dispute and its origins and has subjected it to the scrutiny of this Court and the creditors. Movant has not identified any management decision relating to Debtor's operations that colorably be characterized as mismanagement of Debtor's business. She does not address whether the trustee would even have the regulatory authority to operate this type of business. Movant's assertion that a trustee is needed to investigate the dealings

between Debtor and "insiders" is not supported by anything that hints of any impropriety even though Movant has had months to examine these and any other issues.

**Abstention is Inappropriate**

Movant suggests that this Court abstain and suspend all proceedings in the case under Bankruptcy Code § 305(a). Abstention is appropriate only when the interests of both the creditors and the debtor would be served. As Collier sums up the issue:

> Because of this requirement [serving the interests of both creditors and debtor], few fact patterns fall within section 305(a). Accordingly, parties who wish to seek dismissal of a case based primarily on the debtor's misconduct or bad faith should invoke, in most instances, the dismissal provisions contained in the relevant chapter under which the case was filed.

*2 Collier on Bankruptcy P 305.02* (16th 2021). Movant has not shown that dismissal would serve the interests of any creditor other than Movant. Movant has shown the opposite with regard to the interests of Debtor, since dismissal would leave Debtor facing the destruction of its business if Movant succeeded at trial of the claim.

## CONCLUSION

The Conclusion to Movant's Motion proves Debtor's point: the Motion is nothing more than a closing argument opposing confirmation of the proposed Plan, not a motion based on any colorable argument for dismissal or for removal of the Debtor as debtor-in-possession. Movant's complaints that Debtor could cut some expenses, or that Movant's expert does not agree with Debtor's expert's projections or asset valuations, or that Movant thinks the Plan should contain more disclosures etc. are all objections to confirmation based on Movant's opinions and the opinions of Movant's expert.

Movant's strategy is clear. Movant wants delay in hopes Movant's expert's projections prove true instead of those of Debtor's experts. But in enacting Subchapter V, Congress recognized that uncertainty about projected disposable income was an acceptable trade-off for reducing the time and expense of a regular chapter 11 case. Among other things, Congress chose not to permit anyone other

than the debtor to file a plan or to modify a confirmed plan, even if the reality turned out to depart from the projections. Debtor has filed a confirmable plan based on the best information currently available to it in this uncertain pandemic environment, with the purpose of reorganizing. It should be allowed to have its plan judged at a confirmation hearing, not on a belated motion to dismiss.

  Wherefore Debtor prays this Court to deny the Motion and award Debtor such other relief as it deems proper.

DATED: June 18, 2021

    Respectfully Submitted,

    WEINMAN & ASSOCIATES, P.C.

    By: /s/ Jeffrey A. Weinman
     Jeffrey A. Weinman, #7605
     730 17th Street, Suite 240
     Denver, CO 80202-3506
     Telephone: (303) 572-1010
     Facsimile: (303) 572-1011
     jweinman@weinmanpc.com

    LAW OFFICES OF G. STEPHEN LONG

    /s/ G. Stephen Long
     G. Stephen Long, #17252
     650 S. Cherry Street, Suite 825
     Glendale, CO 80226
     (303) 800-1706
     slong@gsltrial.com

## CERTIFICATE OF SERVICE

I hereby certify that I have served on this 18th day of June, 2021, a true and correct copy of the foregoing **DEBTOR'S OBJECTION AND RESPONSE TO MOTION TO DISMISS BANKRUPTCY CASE PURSUANT TO 11 U.S.C. §§ 1112(b) AND 305(a)(1) OR TO REMOVE THE DEBTOR-IN-POSSESSION UNDER 11 U.S.C. § 1185(a)** by electronic mail through the Court's CM/ECF system using the e-mail addresses on file with the Court as obtained from the parties-in-interest's Notices of Entry of Appearance to the following:

Paul V. Moss, Esq.
U.S. Trustee's Office
1961 Stout St., Ste. 12-200
Denver, CO 80294
Paul.Moss@usdoj.gov

Bavaria Inn Restaurant, Inc. dba Shotgun Willies
ATTN: Deborah Dunafon, President
490 S. Colorado Blvd.
Denver, CO 80246

G. Stephen Long, Esq.
GSL Trial Lawyers
650 South Cherry Street, Suite 825
Glendale, CO 80246
slong@gsltrial.com

Harvey Sender
Subchapter V Trustee
600 17th Street, Suite 2800 South
Denver, CO 80202
hsender@sendertrustee.com

David J. Warner, Esq.
Wadsworth Garber Warner Conrardy, P.C.
2580 W. Main St., Suite 200
Littleton, CO 80120
dwarner@wgwc-law.com

Duncan E. Barber, Esq.
Shapiro Bieging Barber Otteson LLP
7979 E. Tufts Ave., Ste. 1600
Denver, CO 80237
dbarber@sbbolaw.com

Darrell G. Waas, Esq.
Waas Campbell Rivera Johnson & Velasquez LLP
1350 17th Street, Suite 450
Denver, CO 80202
waas@wcrlegal.com

Scott Saltzman, CPA
Saltzman LLC
5655 S. Yosemite St., Suite 205
Greenwood Village, CO 80211
scott@saltzmanllc.com

Joseph N. Casas, Esq.
The Casas Law Firm, P.C.
11844 Bandera Rd., Suite 500
Helotes, TX 78023
joseph@talentrights.law

Peter R. Bornstein, Esq.
The Law Offices of Peter R. Bornstein
6060 Greenwood Plaza Blvd., Suite 500
Greenwood Village, CO 80111
pbornstein@prblegal.com

V. William Scarpato III
Assistant U.S. Attorney
U.S. Attorney's Office
District of Colorado
1801 California Street, Ste. 1600
Denver, CO 80202
victor.scarpato@usdoj.gov

Laura Ellis
Assistant United States Attorney
U.S. Attorney's Office
1801 California Street, Suite 1600
Denver, CO 80202
Laura.Ellis@usdoj.gov

                                                                                        /s/ Lisa R. Kraai